**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| DARIEN HARRIS, | |
| Plaintiff, | |
| v. | Case No. _____ |
| CITY OF CHICAGO, Illinois, DEVINN JONES, ISAAC LAMBERT, CONSTANCE BESTEDA, WILLIAM MEADOR, MARC DELFAVERO, HENRY BARSCH, MATTHEW WEBER, and UNKNOWN OFFICERS OF THE CHICAGO POLICE DEPARTMENT. | **JURY TRIAL DEMANDED** |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiff DARIEN HARRIS, by his attorneys, Loevy & Loevy, complains of Chicago Police Officers DEVINN JONES, ISAAC LAMBERT, CONSTANCE BESTEDA, WILLIAM MEADOR, MARC DELFAVERO, HENRY BARSCH, MATTHEW WEBER, and UNKNOWN OFFICERS; and the CITY OF CHICAGO, Illinois, as follows:

## INTRODUCTION

1.      Due to Defendants' misconduct, Plaintiff Darien Harris was wrongfully convicted of the tragic murder of Ronald Moore – a crime he absolutely did not commit.

2.      In a concerted effort to frame Mr. Harris, the Defendants built a case and convicted Harris almost entirely on the testimony of an eyewitness who was legally blind.

3.      Like countless others, Mr. Harris's odyssey through a criminal justice system was instigated by a Chicago Police Department that too often devalued the lives of people of color.

4.      Mr. Harris's wrongful conviction was caused by the egregious misconduct of the Defendant Chicago police officers who fabricated evidence, including false witness statements and identifications through such tactics as coercion, threats, fact-feeding, and promises of leniency.

5.      Simultaneously, Defendants withheld exculpatory evidence, including evidence that a blind eyewitness could not have identified Mr. Harris as the gunman, evidence pointing to at least two other individuals as the real perpetrators of the crime, and the corrupt tactics they used to generate false evidence against Mr. Harris.

6.      Mr. Harris's wrongful conviction is not an isolated occurrence. Rather, it is part of patterns and practices of systemic police misconduct at the Area Two Police Headquarters, where police officers were trained to fabricate evidence and withhold exculpatory evidence to secure wrongful convictions.

7.      Mr. Harris's wrongful arrest, prosecution, and false imprisonment occurred and continued because command personnel in the Chicago Police Department (hereinafter "CPD"), successive Superintendents of Police and several Mayors of the City of Chicago, most notably former Mayor Richard Mr. Daley, all

concealed and suppressed their knowledge of ongoing police misconduct, blocked and undercut all efforts to expose, discipline, and prosecute offending officers, and refused to intervene to stop the continuing egregious and criminally unconstitutional misconduct.

8.     As a result of Defendants' misconduct, Mr. Harris spent more than twelve years incarcerated for a crime he did not commit. Mr. Harris was finally vindicated on December 5, 2023, when the Cook County State's Attorney's Office agreed that Mr. Harris's convictions should be vacated. On December 19, 2023, the prosecution dismissed the charges, and Mr. Harris was released.

9.     Although Mr. Harris will never get these lost years of his life back and therefore will never be made whole, this lawsuit seeks to redress the violation of Mr. Harris's constitutional rights, obtain compensation for the damage Defendants inflicted upon him, and bring these injustices to light so that similar misconduct never occurs again.

## JURISDICTION AND VENUE

10.     Harris brings this action pursuant to 42 U.S.C. § 1983 and Illinois law to redress Defendants' tortious conduct and the deprivation under color of law of his rights secured by the United States Constitution.

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

12.     Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to this complaint occurred in this judicial district.

## PARTIES

13.     Plaintiff Darien Harris is a 31-year-old citizen of the United States. He spent more than 12 years of his 31 years incarcerated for a murder he did not commit.

14.     At all times relevant to the events described in this complaint, Defendants Devinn Jones, Isaac Lambert, Constance Besteda, William Meador, Marc Delfavero, Henry Barsch, and Matthew Weber were police officers employed by the City of Chicago. They engaged in the conduct complained of herein under color of law and in the course and scope of their employment and are sued in their individual capacity.

15.     Defendant City of Chicago is a municipal corporation that is or was the employer of the above-named Defendants.  Each Defendant acted, during their investigation of the Moore murder, as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*.  Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

16.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

## The Rondell Moore Murder

17.     On June 7, 2011, at approximately 8:27 p.m., Rondell Moore was shot multiple times at a BP gas station on 6600 S. Stony Island Avenue, located on Chicago's South Side.

18.     Rondell was waiting at the gas station with family and friends attempting to have his car inspected by an associate, Quincy Woulard, when someone with a gun approached on foot.

19.     The gunman opened fire, shot Rondell multiple times, and also shot Woulard.

20.     Responding officers arrived at the scene and found Rondell lying on the ground at a nearby Chase Bank parking lot. Rondell was fatally wounded and police were unable to get any information from him.

21.     Officers interviewed Rondell's brother, Ronald Moore. Ronald told the officers that the perpetrator "drove off in a black Lexus with rims".  Ronald did not provide any other information.

22.     Officers then sent out a flash message to be on the lookout for a "black Lexus".

23.     Officers responded to the call and observed a black Lexus traveling eastbound on 67th Street. Officers stopped the car, and Ronald Moore came running up to the driver, pointing and yelling, "you killed my brother."

24.     The driver of the car was a man named Aaron Jones.

25.     At the direction of Defendant Jones, officers transported Aaron Jones to the Area Two police station for questioning.

### The Initial Investigation

26.     Defendants immediately began interviewing individuals who they believed were witnesses to the crime.

27.     On or around June 7, 2011, Defendants Jones and Lambert interviewed Jodie Toney, a BP gas station attendant on duty at the time of the shooting.

28.     According to Defendants Jones and Lambert, Toney claimed he was looking outside of the gas station at the time of the shooting and observed Rondell standing by his car, which had broken down next to a pump.  Jones and Lambert reported that Toney then observed a Black male shooting at Rondell.

29.     According to Defendants Jones and Lambert, Toney stated that the perpetrator had been in the store about an hour before the shooting and threatened to "blow his head off."  Jones and Lambert also reported that Toney called 911 before the shooting because he believed the perpetrator was stealing items from the gas station.

30.     That same day, Defendants Jones and Lambert were informed that a man named Dexter Saffold claimed to witness the shooting.  Defendants Jones and Lambert then went to interview Saffold at his home.

31.     According to Defendant Jones, Saffold told him and Lambert that he was traveling on his scooter, and as he reached the driveway of the gas station, while traveling northbound on Stony Island, he witnessed the shooting.

32.    Saffold reportedly stated that he observed a male with his hair in twists (or dreads) wearing a black tank top and green shorts.

33.    Saffold also reportedly stated that the shooter ran past him while holding the gun.

34.    The same day, Defendants Barsch and Weber interviewed Ronald Moore at the Area Two police station.

35.    According to Barsch, Weber, and Jones, Ronald Moore stated that he observed a black Lexus pull into the gas station and that the perpetrator pointed a handgun out of the passenger window. Ronald also reportedly claimed that, after shooting twelve shots at Rondell, the perpetrator chased another passenger in Rondell's car, Marcus Diggs, across the street and fired six more shots at Marcus.

36.    Barsch, Weber, and Jones also reported that Ronald told police that the perpetrator then ran back to the gas station and got back into the Lexus, which then drove away. According to Defendants, Ronald claimed that the shooter was dark and skinny, between 5'7" and 5'9", was "from 65th and Minerva", and wore a mohawk hair style.

37.    That same day, on June 7, 2011, at approximately 10 p.m., Defendants Jones, Lambert, and others began interrogating Aaron.

38.    Defendants Jones, Lambert, other officers took notes and tape-recorded the statements of Aaron.

39.    Aaron explained that he dropped off a person—who he knew as "Slim"— at the BP station and described what "Slim" looked like.

40.     Aaron explained that he could not identify any perpetrator of the shooting because he was not there when the shooting occurred.

41.     Unable to secure a false statement from Aaron identifying the shooter, Defendants Jones and Lambert discussed the interrogations with Defendants Besteda, Meador, Delfavero, Barsch, Weber, and others.

42.     They collectively reached an agreement to keep Aaron in custody and continue the interrogation into the next day.

43.     On the morning of June 8, 2011, Defendants Jones, Lambert, and others resumed the interrogation.

44.     This time, they subjected Aaron to repeated verbal abuse and screamed at him. Defendant Jones told Aaron they needed a "fucking name", or they would ensure that he was charged with the murder. Defendants continued to interrogate Aaron for approximately 10 hours on June 8th. He asked for a phone call and a lawyer, but Defendants refused.

45.     Still unable to secure a false statement from Aaron identifying the shooter, Defendants Jones and Lambert discussed the interrogations with Defendants Besteda, Meador, Delfavero, Barsch, Weber, and other officers. They agreed to keep Aaron in custody another day to continue the interrogation.

46.     On the morning of June 9, 2011, Defendants Jones and Lambert continued the interrogation.

47.     They told Aaron that the victim was dead and that he would spend the rest of his life in prison for murder and threw him into a physical lineup to escalate

Aaron's fear, already caused by the extensive interrogation.

48.     Aaron pleaded with Defendants Jones and Lambert that "[he] just want[ed] to go home".

49.     Defendant Jones told Aaron that his request was not possible until he gave him some names besides "Slim". Aaron cried and repeated that the person he dropped off at the gas station was "Slim".

### Video Surveillance Shows Unreliability of Saffold and Moore as Eyewitnesses

50.     On or around the morning of June 8, 2011, Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch, Weber, and others reviewed the BP gas station surveillance footage and learned that Saffold and Ronald Moore's statements to police were demonstrably false and that Saffold and Ronald could not have identified the perpetrator based on their statements.

51.     At that point, Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch, Weber, and other officers knew that the only eyewitness who could both identify the perpetrator and whose statements to police were corroborated by the surveillance video was Jodie Toney, and not Ronald Moore or Dexter Saffold.

52.     Nevertheless, Defendants preferred witnesses such as Ronald Moore and Dexter Saffold, who they could use to mold their statements and falsely identify the perpetrator they chose to the pin the crime on.

### Defendants Decide to Pin the Crime on Harris

53.     At the time of the shooting, Mr. Harris was 18 years old, mere weeks from his high school graduation, and planning to attend college.

9

54.     He was nowhere near the gas station and was spending time with his then-girlfriend, Kenecia Irvina at a house on 43rd Street and Indiana Avenue, miles away from the BP gas station.

55.     Mr. Harris apparently may have come to law enforcement's attention from a music video posted on social media. There were dozens of Black teenagers in the video, including Mr. Harris.

56.     Defendants decided to force Aaron Jones, who had already been interrogated for nearly two days, to make an identification.

57.     Defendant Jones and other officers brought in a laptop and asked Aaron to start identifying the Black teenagers in the video.

58.     Aaron identified some names or nicknames of the boys that he could recall, including Devonte Pippen, also known as "Slim".

59.     Mr. Harris was also one of the dozens of teenagers in the music video.

60.     Defendants Jones and Lambert discussed the individuals identified by Aaron—including Devonte Pippen—with Besteda, Meador, Delfavero, Barsch, Weber, and others.

**Defendants Fabricate Evidence to Frame Mr. Harris**

61.     During the interrogation, Defendants Jones and Lambert explicitly told Aaron what to say and write to implicate Mr. Harris.  Shortly after they showed him Mr. Harris in the video, they told Aaron they needed him to identify Harris in a photo array and to circle Mr. Harris's photo.

62. On the evening of June 9, after days of being interrogated, Aaron finally broke down and told Defendants Jones, Lambert, and others that he would say whatever Defendants told him to say if they would let him go home. He relented and agreed to provide Defendants' fabricated account and identification, and falsely implicated Mr. Harris.

63. Afterwards, Defendants Jones, Lambert, and other officers agreed to release Aaron without charging and to arrest Mr. Harris for murder.

64. Aaron later testified that these illegal and coercive tactics led him to give a fabricated account and identification and that his other truthful, exculpatory statements were suppressed.

65. While Defendant Jones took the lead role during the interrogation of Aaron, one or more of Defendants Lambert, Besteda, Meador, Delfavero, Barsch, Weber, and others were present at various points during the interrogation of Aaron, during which they each observed Defendant Jones's coercive tactics and personally participated in the use of those tactics to secure a false statement implicating Mr. Harris.

66. None of the Defendants took any steps to prevent the coercive interrogation tactics from being used on Aaron, despite being present in the interrogation room, and having the opportunity and ability to intervene. Nor did Defendants inform a supervisor about the misconduct taking place, or protest or speak out in any way.

**Defendants Fabricate Evidence to Frame Mr. Harris After His Arrest**

67. There was no physical evidence linking Mr. Harris to the crime. None of the fingerprints found at the crime scene matched Mr. Harris and there was no DNA evidence implicating Harris—even after authorities conducted a thorough and close inspection of evidence found at the scene.

68. Without any physical evidence to tie Mr. Harris to the shooting, the State had to rely on additional fabricated evidence created by Defendants Lambert, Besteda, Meador, Delfavero, Barsch, Weber and others.

69. For example, Defendants Jones, Lambert, and Besteda fabricated reports that Dexter Saffold supposedly identified Mr. Harris in a physical lineup on June 15, 2011.

70. Defendants Jones, Lambert, Besteda, and others observed that Saffold was unable to positively identify Mr. Harris in a lineup.  He was too visually impaired to identify Mr. Harris as the perpetrator during the shooting, or to identify him positively in a physical lineup.

71. In fact, Dexter Saffold had been designated permanently legally blind for at least nine years before Defendants claimed he positively identified Mr. Harris as the shooter during the physical lineup.

72. Defendants Jones and Lambert also fabricated Saffold's typed statement, knowing that he was too visually impaired to read it.

73. Simultaneously, Defendants suppressed the police reports from the defense demonstrating that Saffold was unable to identify Mr. Harris.

74.     Still not done, Defendants, including Jones, Lambert, Moore, Weber, and others, fabricated additional evidence by Ronald Moore, helping him change his statement to make it seem that he could identify the perpetrator and address significant discrepancies in his previous statements to police.  For example, although his reported initial statement to Barsch and Weber was that the shooter chased a witness, Marcus Diggs, across the street before fleeing, Jones, Lambert, Barsch, Weber, and others helped Ronald craft a statement to eliminate that falsity.

**Defendants Suppress Exculpatory Evidence**

75.     In their rush to frame Mr. Harris, Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch, Weber and others suppressed information that pointed to the real perpetrator.

76.     Early in their investigation, Defendants received information that Devonte Pippen was the "Slim" that Aaron was referring to when he described the person he dropped off at the BP gas station before the murder.

77.     Only minimal information that Aaron Jones had identified someone else was known to Plaintiff and his defense team at the time of his criminal trial; the full details of the reports and statements of Aaron, which would have aided Mr. Harris's defense team in their efforts to establish alternatives suspects, were suppressed by Defendants and were not made available to the prosecution or to the defense prior to Mr. Harris's convictions in 2014.

78.     The withholding deprived Mr. Harris of the opportunity to identify the real perpetrator, and thereby establish his innocence.

79. The Defendants never interviewed, arrested, or otherwise investigated Pippen. He was never included in any lineup where he could have been identified as the perpetrator.

80. Instead, Defendants told Aaron to pick Mr. Harris out of the lineup and did the same with Toney. Defendants also showed Toney a photograph of Mr. Harris and told him to select Mr. Harris, but he refused and told the police that Mr. Harris was not the perpetrator. This information was withheld and suppressed by Defendants.

81. Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch, Weber and others also knew that Rondell Moore was involved in a deadly gang war with boys over on 67th and Evans, the E. Block Set of the Gangster Disciples, and the Defendants received information implicating him in the shooting for which Mr. Harris was charged, which they withheld.

82. Moreover, pursuant to their agreements, Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch, Weber and others suppressed, withheld, or destroyed additional exculpatory evidence. This additional evidence included:

- Dexter Saffold's statements during the physical lineup and taking of his statement, in which he truthfully stated that he was visually impaired, could not positively identify Harris, and which Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch and Weber suppressed and/or destroyed.

- Jodie Toney's statements, in which he was pressured by Defendants Jones, Lambert, and others to falsely identify Harris in a photo array and physical lineup, but refused to do so, and Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch, and Weber suppressed and/or destroyed.

- Evidence of the agreement reached between Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch and Weber to fabricate false evidence against Mr. Harris, including evidence of all the communications between these Defendants in forming, discussing, and acting in the furtherance of the agreement, which would have served as powerful evidence to impeach the testimony of these Defendants at Mr. Harris's trial, as well as powerful independent evidence of his innocence.

83. None of these additional pieces of exculpatory evidence were provided to the defense prior to Mr. Harris's conviction in 2014.

84. Throughout the course of the Moore murder investigation, Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch and Weber kept one another informed regarding developments in the investigation, the evidence being fabricated to falsely implicate Mr. Harris, and the exculpatory evidence that had been suppressed, withheld, or destroyed.

85. Each of these Defendants agreed that they would take whatever steps necessary to implicate a suspect and develop evidence to secure a conviction for the crime, without regard for the constitutional rights of the individuals involved, the legality of their tactics, or the truth or falsity of the evidence they would develop.

Pursuant to this agreement, Defendants fabricated evidence against Mr. Harris, suppressed evidence, and otherwise conspired to frame Mr. Harris for a crime he did not commit.

86. Each of these Defendants was, at various points, physically present with other officers while fabrication and suppression of evidence was evident and/or discussed.

87. At no point did any of these Defendants reveal the existence of the fabricated or suppressed evidence, report the misconduct to any supervisor, protest or speak out, or take any steps to intervene in any way to stop the violation of Mr. Harris's rights. The individual Defendants failed to intervene to bring these issues to light pursuant to the agreement they had amongst themselves to frame Mr. Harris for the Rondell Moore murder regardless of his innocence.

### Plaintiff's Conviction

88. Mr. Harris's trial was made unfair by the Defendants' misconduct.

89. The Defendants' fabrication of false evidence and suppression of exculpatory evidence caused Mr. Harris to be wrongfully convicted for the Moore murder. This included the fabricated statements and testimony of a legally blind eyewitness, Dexter Saffold, upon which the court concluded that "[t]his case, especially when you consider the testimony of Saffold, was not a particularly close one."

90. For crimes that Mr. Harris did not commit, he was sentenced to 76 years in prison.

**Plaintiff's Exoneration**

91.     Mr. Harris never gave up fighting to prove his innocence.

92.     On February 24, 2022, Mr. Harris filed a post-conviction petition with new evidence of his innocence, including: (1) medical records, federal lawsuits, and an expert report providing that Dexter Saffold was legally blind for years leading up to this crime; (2) an affidavit from gas station attendant Jodie Toney affirming that Mr. Harris was not the shooter, identifying the actual shooter as Devonte Pippen, and describing the police threats and coercion in an attempt to force a false identification of Harris; (3) and an eyewitness expert report concluding that the eyewitness identifications were "highly unreliable".

93.     On December 5, 2023, the State conceded and asked the Circuit Court of Cook County to vacate Mr. Harris's convictions.  On that same day, the court vacated Mr. Harris's convictions but reinstated the charges.

94.     Two weeks later, on December 19, 2023, the State dropped all charges and Mr. Harris finally became a free man and returned home to his friends and family after more than 12 years of wrongful incarceration.

**Policy and Practice of Wrongly Convicting Innocent Individuals**

95.     The misconduct by the Defendants, described in detail above, was undertaken pursuant to the policies and practices of the Chicago Police Department.

96.     Mr. Harris was the victim of, and his injuries were proximately caused by, policies and practices on the part of the Chicago Police Department to pursue and

secure false convictions through profoundly flawed investigations and unconstitutional methods and tactics.

97. At the time of the Chicago Police Department's investigation into the 2011 Moore murder, in the period leading up to Mr. Harris's wrongful conviction in 2014, and for a period continuing thereafter, the Chicago Police Department, including some or all of the Defendants in this case, engaged in a systematic pattern of fabrication of evidence, withholding of exculpatory information, and other illegal tactics, the sum total of which completely corrupted the investigative process.

98. Since 2011, dozens of cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to cause the conviction of an innocent person for serious crimes he did not commit.

99. These cases include many in which Chicago police officers used the same tactics Defendants employed against Plaintiff in this case, including fabricating evidence, concealing exculpatory evidence, manipulating eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction, without probable cause and without regard for the person's actual guilt or innocence.

100. This pattern of the Chicago Police Department's misconduct pre-dates the Moore murder investigation, demonstrating that the misconduct perpetrated against Mr. Harris was the product of long-established policies and practices at the Chicago Police Department and longstanding disregard for the constitutional rights of criminal suspects.

101.   The Chicago Police Department's Office of Professional Standards acknowledged, in its "Goldston Report," that "abuse did occur and that it was systematic" at Area Two, going back as far as 1990.  The report found that there was systematic abuse of suspects held in custody at Area Two and that Area Two command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it.

102.   In 1991, the Goldston Report was supplemented with a finding that Defendants Burge and others were among the prime movers in this pattern of abuse.

103.   The CPD's policy and practice of misconduct was recently further described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, among other things, that in the 1990s Chicago police detectives fed information to witnesses and coached them through court-reported and handwritten statements, coerced witnesses into sticking to a detective's theory of the case, physically abused witnesses, and worked together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

104.   At all relevant times, members of the Chicago Police Department, including Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the police department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files

were withheld from the State's Attorney's Office and from criminal defendants, and were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

105.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

106.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established in the cases of, *inter alia, Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

107.    The policies and practices of suppressing exculpatory and/or impeaching evidence at issue in *Rivera, Fields,* and *Jones* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Moore murder investigation at issue here.

108.    In addition, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

109.    Before and during the period in which Plaintiff was falsely charged with and convicted of the Moore murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating

the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

110. The U.S. Department of Justice recently issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

111. On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports

in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

112.    The DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints were sustained, discipline was inconsistent and unpredictable.

113.    Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority." Between 2004 and 2016, the City recommended disciplinary action in fewer than 4% of cases in which it paid settlements to plaintiffs alleging violation of their civil rights and did not conduct any disciplinary investigations in over half of those cases.

114.    Since before Mr. Harris's arrest and continuing for years afterward, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

115.    Mayor Rahm Emmanuel, former mayor of the City of Chicago, recently acknowledge the existence of CPD's code of silence.

116.    Charlie Beck, the former interim superintendent of the CPD, recently acknowledged the existence of the CPD's code of silence.

117.    In March 2019, Defendant Lambert acknowledged CPD's code of silence in another case, and that officers asked him to fabricate police report to cover up police misconduct.

118.    As a result of the City of Chicago's established practices, Defendants came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

119.    Defendants engaged in such misconduct because they had no reason to fear that the City of Chicago and its police department would ever discipline them for doing so.

120.    Several of these Defendants worked in Area Two, whose long history of engaging in the kind of investigative misconduct that occurred in this case, including

manipulating eyewitness identifications and fabricating and concealing evidence in the course of maliciously prosecuting innocent persons, is well-known and widely acknowledged.

121. It was not until 2011 that Chicago Police Department Commander Jon Burge was sentenced for lying about ever using, or being aware of other officers, using any type of coercion with suspects who were in custody at Area Two.

122. Today, there are dozens of known cases in which Chicago police officers at Area Two engaged in the serious investigative misconduct described above. They engaged in such misconduct because they had no reason to fear that their supervisors would ever discipline them for doing so.

123. The City of Chicago and its police department also failed, in the years prior to Mr. Harris's conviction, to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

- The conduct of live lineups, photographic arrays, and other identification procedures.

- Preserving material evidence, such as photographic arrays used for identification purposes.

- The constitutional requirement to preserve and disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

- The need to refrain from psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

- The risks of wrongful convictions and the steps police officers should take to minimize risks.

- The risks of engaging in tunnel vision during investigations.

- The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

- The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Mr. Harris's wrongful conviction and his injuries.

124. The City's failure to train, supervise, and discipline its officers, including Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch, and Weber, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Mr. Harris in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices, as alleged above.

125. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They

thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

126.    The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

### Plaintiff's Damages

127.    Plaintiff was 18 years old, in the prime of his life, at the time that he was wrongfully arrested and then convicted of a crime he did not commit.

128.    He was planning to attend college after his upcoming high school graduation.

129.    Instead, he would spend the next nearly thirteen years incarcerated for something he did not do.

130.    Plaintiff's whole life was turned upside down without any warning. Defendants' misconduct caused Plaintiff unfathomable damages. For example, because of Defendants' misconduct, Plaintiff has missed out on participating in the lives of his family and friends.

131.    Plaintiff was also deprived of opportunities to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Plaintiff has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

132.    During his over twelve years of wrongful incarceration, Plaintiff was detained in harsh and dangerous conditions in maximum security prisons.

133.    He was physically injured and assaulted numerous times.

134.    Plaintiff lived in constant emotional anguish, never knowing whether the truth would come out and whether he would ever be exonerated.

135.    Defendants' misconduct not only caused the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty but continues to cause Plaintiff ongoing health effects to this day, including extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects.

## COUNT I
### 42 U.S.C. § 1983
### Fabrication of False Evidence in Violation of Due Process
### (Fourteenth Amendment)

136.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

137.    In the manner described more fully above, the Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and due process by fabricating evidence, including witness statements implicating Plaintiff in crimes he did not commit, which Defendants knew to be false, and by suppressing their own misconduct and the circumstances in which these witness statements were obtained.

27

138.    As described more fully above, Defendants fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, suborned perjury, obtained Plaintiff's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal trial.

265.  For example, as described more fully above, Defendants interrogated Aaron Jones for more than two days and knowingly fed facts to witnesses to secure false witness statements—from persons including Jones and Saffold—implicating Plaintiff in the Moore murder.

269.    In addition, Defendants fabricated additional evidence that is not yet known to Plaintiff.

270.    Defendants' misconduct directly resulted in Plaintiff's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued.

271.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

267. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and

emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT II
### 42 U.S.C. § 1983
### Suppression and Withholding of Exculpatory Evidence
### in Violation of Due Process
### (Fourteenth Amendment)

272.   Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

273.   As described more fully above, Defendants, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

274.   In the manner described more fully above, Defendants deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution.

275.   In addition, the Defendants concealed additional evidence that is not yet known to Plaintiff.

276.   Defendants' misconduct directly resulted in Plaintiff's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to

a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued.

277.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence. As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT III
### 42 U.S.C. § 1983
### Deprivation of Liberty without Probable Cause
### (Fourth and Fourteenth Amendments)

278.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

279.    In the manner described more fully above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured and suppressed exculpatory evidence to accuse Plaintiff of criminal activity and cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause.

280.    In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

281. These Defendants initiated and continued judicial proceedings against Plaintiff maliciously, resulting in injury.

282. The judicial proceedings against Plaintiff were terminated in his favor when the Cook County State's Attorney dismissed all charges against him.

283. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

284. As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

285. The misconduct in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT IV
### 42 U.S.C. § 1983
### Failure to Intervene

286. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

287. In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so during the lengthy prosecution of Plaintiff and the aftermath of

his conviction, such as by disclosing the misconduct to supervisors, the prosecutor, or Plaintiff's criminal defense counsel. These Defendants had ample, reasonable opportunities to prevent constitutional injury to Plaintiff but failed to do so.

288. As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.

289. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

290. The misconduct in this Count by the Defendants was undertaken pursuant to the police and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT V
### 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

291. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

292. The individual Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for

a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

293.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

294.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

295.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

296.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

297.    The misconduct in this Count by the Defendants was undertaken pursuant to the police and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT VI**
**42 U.S.C. § 1983**
**Policy and Practice Claim Against the City of Chicago**

298.    Plaintiff incorporates each paragraph of this Complaint as if restated fully herein.

299.    As described more fully herein, the City of Chicago is itself liable for the violation of Plaintiff's constitutional rights.

300.    Plaintiff's injuries were caused by the policies, practices, and customs of the Chicago Police Department, in that employees and agents of the Chicago Police Department regularly fabricated false evidence implicating criminal defendants in criminal conduct, such as by using the improper tactics described above to fabricate false witness statements; failed to disclose exculpatory evidence to criminal defendants; pursued wrongful convictions through profoundly flawed investigations; and otherwise violated due process in a similar manner that alleged herein.

301.    The above-described widespread practices and customs, which were so well-settled as to constitute the de facto policy of the Chicago Police Department, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, the above-described widespread practices were allowed to flourish because the Chicago Police Department declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who fabricated false evidence and witness testimony, withheld material evidence, and pursued wrongful convictions.

302.    The constitutional violations described in this complaint were also undertaken pursuant to the policies and practices of the Chicago Police Department in that the constitutional violations against Mr. Harris were committed with the knowledge or approval of persons with final policymaking authority for the City of

34

Chicago and the Chicago Police Department or were actually committed by persons with such final policymaking authority.

303.   Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago and the Chicago Police Department, including but not limited to Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch, and Weber, who acted pursuant to one of more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

304.   The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer grievous and permanent injuries and damages set forth above.

## COUNT VII
## State Law Claim – Malicious Prosecution

305.   Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

306.   In the manner described more fully above, Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

307.   In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

308.   Plaintiff's criminal prosecution was terminated in his favor, in a manner indicative of innocence.

309.    Defendants' actions were taken under color of law and within the scope of their employment.

310.    As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
## State Law Claim
## Intentional Infliction of Emotional Distress

311.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

312.    Defendants' actions, omissions, and conduct, as set forth above, were extreme and outrageous.

313.    These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or with reckless disregard for the probability that they would cause, Plaintiff severe emotional distress, as more fully alleged above.

314.    As a direct and proximate result of the Defendants, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
## State Law Claim
## Civil Conspiracy

315.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein. At the outset of their investigation, the individual Defendants communicated together and agreed that they would take whatever steps necessary to implicate a suspect and develop evidence to secure a conviction for these crimes without regard for the constitutional rights of the individuals involved, the legality of their tactics, or the truth or falsity of the evidence they would develop. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of these rights.

316.    In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

317.    In furtherance of this conspiracy, a tortious action was committed against Plaintiff.

318.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
## State Law Claim
## *Respondeat Superior*

319.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

320.    While committing the misconduct alleged in the preceding paragraphs, Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch, and Weber were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

321.    Defendant City of Chicago is liable as principal for all state law torts committed by its agents.

**COUNT XI**
**State Law Claim**
**Indemnification Pursuant to 745 ILCS 10/9-102**

322.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

323.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

324.    Defendants Jones, Lambert, Besteda, Meador, Delfavero, Barsch, and Weber were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein. The City of Chicago is responsible for paying any judgment entered against these Defendants. Plaintiff therefore demands judgment against Defendant City of Chicago in the amounts awarded to Plaintiff against these Defendants as damages, attorneys' fees, costs, and interest.

WHEREFORE, Plaintiff Darien Harris, respectfully requests that this Court enter a judgment in his favor and against Defendants the City of Chicago; and Devinn

Jones, Isaac Lambert, Constance Besteda, William Meador, Marc Delfavero, Henry Barsch, and Matthew Weber, and Unknown Employees of the City of Chicago, awarding compensatory damages, attorneys' fees, costs, and pre- and post-judgment interest against each Defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Darien Harris hereby demands a trial by jury pursuant to Federal Rules of Civil Procedure 38(b) on all issues so triable.

Dated:  April 22, 2024

Respectfully submitted,

DARIEN HARRIS

By: /s/ Quinn K. Rallins
*One of Plaintiff's Attorneys*

Jon Loevy
Quinn K. Rallins
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
rallins@loevy.com