UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Darien Harris,

    *Plaintiff,*

v.

City of Chicago, *et al.*,

    *Defendants.*

No. 24 CV 3215

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Plaintiff Darien Harris brings this lawsuit against the City of Chicago and certain police officers for injuries arising out of his wrongful conviction for the murder of Rondell Moore. For the reasons explained, the Officers' motion to dismiss [Dkt. 33] and City's motion to dismiss [Dkt. 34] are both granted in part and denied in part.[1]

## I.    Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the plaintiff's claims. The Court takes well-pleaded factual allegations as true and draws reasonable inferences in the plaintiff's favor. *Reardon v. Danley*, 74 F.4th 825, 827 (7th Cir. 2023); *Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 638 (7th Cir. 2023). "To survive a motion to dismiss under Rule 12(b)(6), plaintiff's complaint must allege facts which, when taken as true, plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (cleaned up).

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

## II.    Background[2]

Rondell Moore was murdered outside a gas station on June 7, 2011 while his brother, Ronald looked on. [Dkt. 1 at ¶¶17–21.] Ronald reported to police officers who arrived at the scene that the perpetrator drove off in a black Lexus. [*Id.* at ¶21.] Not long after, officers pulled over Aaron Jones, who was driving a black Lexus. [*Id.* at ¶¶23–34.] During police interrogation, Jones admitted to dropping off "Slim" at the gas station but left before any shooting occurred. [*Id.* at ¶¶39–40.] The interrogation continued over the course of several days, during which officers subjected Jones to verbal abuse, refused his requests for counsel, and demanded he give "Slim's" name. [*Id.* at ¶¶43–49.]

According to Harris, officers decided to pin Moore's murder on Harris who may have come to their attention through a music video posted on social media. [*Id.* at ¶¶53–61.] Officers showed Jones the music video and told him to identify the people in the video. [*Id.* at ¶¶55–58.] He identified some, including "Slim" whose name was Devonte Pippen. [*Id.* at ¶58.] Officers identified Harris in the video, told Jones to implicate Harris, and had Jones identify Harris in a photo array. [*Id.* at ¶61.] After multiple days of interrogation, Jones agreed, and police released him without charges. [*Id.* at ¶62.]

Officers, several of whom worked in the Area Two police department, also interviewed people who they believed witnessed Moore's murder. [*Id.* at ¶¶26, 120.]

---

[2]    The following factual allegations are taken from Harris' Complaint [dkt. 1] and are accepted as true for the purposes of the motion. *Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). In setting forth the facts at the pleading stage, the Court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

One, Jodie Toney, the gas station attendant, told officers that the perpetrator, a Black male, had been in the gas station earlier in the day and threated to "blow his head off" which led to Toney calling the police. [*Id.* at ¶29.] Another man, Dexter Saffold, claimed to have witnessed the shooting as he was traveling by on his scooter. [*Id.* at ¶¶30–31.] He described the shooter as a male with twists or dreads in his hair, wearing a black tank top and green shorts. [*Id.* at ¶32.] Officers also interviewed Ronald Moore who stated that he witnessed a black Lexus pull into the gas station and the perpetrator point a handgun out of the passenger window. [*Id.* at ¶35.] According to Moore, the perpetrator then chased another person across the street, firing more shots, before returning to the gas station and driving away. [*Id.*] Ronald described the shooter as dark and skinny, between 5'7" and 5'9", with a mohawk hairstyle. [Id. at ¶36.] He believed the perpetrator was "from 65th and Minerva." [*Id.*]

Police reviewed surveillance footage from the gas station and learned that both Saffold and Ronald's statements were demonstrably false. [*Id.* at ¶50–51.] The only witness whose statements were corroborated by the surveillance footage was Toney. [*Id.* at ¶51.] Despite this knowledge, officers forced Jones to implicate Harris. [*Id.* at ¶61.]

To substantiate Harris' culpability, the officers fabricated evidence including a report that Saffold identified Harris in a physical lineup. [*Id.* at ¶¶68–69.] Officers observed that Saffold was unable to positively identify Harris due to a visual impairment (he had been designated legally blind). [Id. at ¶¶70–71.] Officers also fabricated Saffold's statement, knowing he was too visually impaired to read it. [*Id.*

at ¶72.] In addition, officers suppressed reports showing that Saffold was unable to identify Harris. [*Id.* at ¶72.] Officers fabricated additional evidence to alter Ronald Moore's statement to make it seem as though he could identify the perpetrator, too. [*Id.* at ¶74.]

According to Harris, officers also suppressed information about Jones's identification of Slim — Devonte Pippen — from Harris and his defense team. [*Id.* at ¶76-77.] The details of the reports and statements Jones made, implicating Slim, would have aided in Harris's defense. [*Id.* at ¶¶77–78.] Also suppressed was evidence that officers directed Toney to pick Harris out of a lineup but Toney refused, maintaining Harris was not the perpetrator. [*Id.* at ¶80.] Officers suppressed Saffold's statements about his visual impairment and inability to positively identify Harris. [*Id.* at ¶82.] They suppressed information about their agreement to fabricate false evidence against Harris, which would have been powerful evidence at trial. [*Id.*] They also agreed to conspire to frame Harris for Moore's murder, disregarding his constitutional rights and the legality of their tactics. [*Id.* at ¶85.]

Harris was convicted of Moore's murder and sentenced to 76 years in prison. [*Id.* at ¶90.] But on December 5, 2023, after Harris filed his post-conviction petition, the State asked the Circuit Court to vacate the convictions. [*Id.* at ¶93.] Two weeks later the State dropped all charges, and Harris was permitted to return home after more than 12 years' imprisonment. [*Id.* at ¶94.]

Harris alleges officers engaged in the misconduct that led to his conviction pursuant to CPD policies and practices. [*Id.* at ¶¶95–96.] During the investigation of

4

Moore's murder in 2011, the time leading up to Harris' wrongful conviction, and for a period continuing after, CPD, including some or all of the officer defendants, engaged in a systematic pattern of fabrication of evidence, withholding exculpatory information, and other illegal tactics which corrupted the investigative process. [*Id.* at ¶97.]

According to the Complaint, since 2011, dozens of cases have come to light in which CPD officers fabricated false evidence or suppressed exculpatory evidence to cause wrongful convictions. [*Id.* at ¶98.] The cases include many where CPD used the same tactics defendants allegedly employed here against Harris. [*Id.* at ¶99.] The pattern of CPD misconduct predates the Moore investigation, Harris says, demonstrating that the misconduct perpetrated against him was the product of long-established policies and practices of disregarding criminal suspects' constitutional rights. [*Id.* at ¶100.]

Harris alleges that members of CPD, including defendants, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports and other information, keeping them in files at the police department, and never disclosing them. [*Id.* at ¶104.] As a matter of widespread custom and practice, these files were withheld from both the State's Attorney's Office and criminal defendants. [*Id.*] The files were then routinely destroyed or hidden at the close of the investigation. [*Id.*] According to Harris, this policy and practice was established in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No.

87 C 2536 (N.D. Ill.), and applied from the 1980s through the 2000s, including at the time of the Moore murder investigation. [*Id.* at ¶¶106-07.]

Harris also alleges that the City and CPD routinely failed to investigate cases in which detectives charge an innocent person with a serious crime and failed to discipline officers for such misconduct. [*Id.* at ¶108.] He claims that during the Moore murder investigation the City operated a dysfunctional disciplinary system for officers accused of serious misconduct and almost never imposed significant discipline against those officers. [*Id.* at ¶109.] The disciplinary apparatus had no mechanism to identify officers who were repeatedly accused of engaging in misconduct. [*Id.*]

Harris cites several reports to help substantiate his *Monell* claim. One is CPD's Goldston report which acknowledged that "abuse did occur and that it was systematic at [the] Area Two [police department], going back as far as 1990." [*Id.* at ¶101.] The report found command personnel were aware of the systematic abuse in Area Two and encouraged it. [*Id.*] An FBI report documents that in the 1990s CPD detectives fed information to witnesses and coached, coerced, and physically abused them to develop and rehearse false narratives. [*Id.* at ¶103.]

A recent DOJ report found "engrained deficiencies in systems CPD uses to provide officers with supervision and training." [*Id.* at ¶110.] It concluded that among other things "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive or even opportunity, for supervisors to meaningfully guide and direct CPD officers." [*Id.* at ¶111.] There is "even less incentive for supervisors to hold officers

accountable when they deviate from CPD policy and the law." [*Id.*] The report concluded that the City failed to investigate nearly half of misconduct complaints, and when complaints were sustained, discipline was inconsistent and unpredictable. [*Id.* at ¶112.]

An April 2016 report from the CPD Accountability Task Force reported that "[g]oing back years, and continuing to the present day, CPD … missed opportunities to make accountability an organizational priority." [*Id.* at ¶113.] It recommended disciplinary action in fewer than 4% of cases in which it paid settlements to plaintiffs alleging violation of their civil rights and did not conduct any disciplinary investigations in over half of those cases. [*Id.*]

Harris alleges that prior to his arrest and continuing for years after, municipal policy makers and department supervisors condoned and facilitated a code of silence within the CPD. [*Id.* at ¶114.] In accordance with that code, officers refused to report and otherwise lied about misconduct committed by their colleagues including the misconduct at issue in this case. [*Id.*] Former Mayor Rahm Emmanuel, former police superintendent Charlie Beck, and Defendant Lambert all acknowledged the existence of a code of silence. [*Id.* at ¶¶115–117.] In March 2019, in conjunction with another case, Defendant Lambert admitted officers asked him to fabricate a police report to cover up misconduct. [*Id.* at ¶117.] As a result of the City's established practices, the

defendant officers came to believe they could violate civil rights without fear of adverse consequence. [*Id.* at ¶118.]

Harris alleges the City also failed to provide CPD officers adequate training in many areas including constitutional evidence disclosure requirements. [*Id.* at ¶123.] The City's failure to train, supervise, and discipline officers including the officers in this case condones, ratifies, and sanctions the misconduct that the defendants committed against Harris. [*Id.* at ¶124.] The policies and practices were also approved by City policymakers who were deliberately indifferent to the violations of constitutional rights. [*Id.* at ¶126.]

## III. Analysis

Harris brings the following claims: (1) evidence fabrication in violation of the Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; (2) suppression and withholding evidence in violation of the Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; (3) deprivation of liberty without probable cause in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983; (4) failure to intervene in violation of 42 U.S.C. § 1983; (5) conspiracy to deprive constitutional rights in violation of 42 U.S.C. § 1983; (6) a *Monell* policy and practice claim against the City of Chicago pursuant to 42 U.S.C. § 1983; (7) a state law claim for malicious prosecution; (8) a state law intentional infliction of emotional distress claim; (9) a state law civil conspiracy claim; (10) a state law *respondeat superior* claim; and (11) a state law indemnification claim.

The Officers moved to dismiss Count III under the Fourteenth Amendment and Count VIII in its entirety. [Dkt. 33.] The City moved to dismiss Count VI, the *Monell* liability claim, and Counts X and XI for *respondeat superior* liability and indemnification, arguing that if any claim against the Officers is dismissed the corresponding *respondeat superior* and indemnification claim should also be dismissed. [Dkt. 34 at 22.]

### A.    Count III: Deprivation of Liberty Without Probable Cause

Harris brings Count III under § 1983 to assert his rights under the Fourth and Fourteenth Amendments, [Dkt. 1 at 30], and the Officers moved to dismiss the claim under the Fourteenth Amendment, arguing that per *Lewis v. City of Chicago*, 914 F.3d, 472 (7th Cir. 2019), it is not cognizable. [Dkt. 33 at 4.]

The Officers are correct. In *Lewis* the Seventh Circuit established that "a § 1983 claim for unlawful pretrial detention rests *exclusively* on the Fourth Amendment." *Id.* at 478. Harris argues that *McDonough v. Smith*, 588 U.S. 109, 115 (2019), which post-dates *Lewis*, suggests uncertainty in this area of law. Not so. In *McDonough* the Supreme Court merely assumed without deciding that a liberty deprivation right accrued under the due process clause of the Fourteenth Amendment because it had not granted certiorari on that issue. *Id.* at 115 & n.2. The Seventh Circuit has reaffirmed its holding in *Lewis* several times post-*McDonough*. *See, e.g.*, *Kuri v. City of Chicago*, 990 F.3d 573, 575 (7th Cir. 2021). Given *Lewis* is binding law in this Circuit, the Court must apply it and dismiss Harris's liberty deprivation claim

premised on the Fourteenth Amendment. Harris may proceed with this claim as a Fourth Amendment liberty deprivation claim.

### B.    Count VI: *Monell* Policy and Practice Claim

Harris brings a *Monell* claim against the City. A *Monell* claim challenges the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 694 (2018).

"For a *Monell* claim to survive a motion to dismiss, a plaintiff must plead facts that plausibly suggest" four factors are met. *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 524 (7th Cir. 2023). First, that he was deprived of a constitutional right; second, that the deprivation can be traced to some municipal action (*i.e.* a policy or custom); third, that the policy or custom demonstrates municipal fault (*i.e.* deliberate indifference); and fourth, that the municipal action was the moving force behind the federal-rights violation. *Id*.

Related to the second factor, the Seventh Circuit has recognized "three types of municipal action that can support municipal liability under § 1983: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022) (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)). Harris proceeds down the second path, attempting to allege a widespread practice.

10

While Federal Rule of Civil Procedure 8(a)—not some higher standard—applies to causes of action for municipal liability, *White v. City of Chicago*, 829 F.3d 837, 843–44 (7th Cir. 2016), when it comes to alleging a widespread policy or custom, the plaintiff must allege others were impacted by the same policy that caused his injury. *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (affirming dismissal of *Monell* claim where plaintiff failed to allege that police officers took similar actions against other people). Where plaintiff's only allegations pertain to his own alleged constitutional violation and do not permit an inference that the violation was caused by a policy or practice that impacted others, courts have dismissed *Monell* claims at the motion to dismiss stage. *Williams v. City of Chicago*, 2017 WL 3169065, at *9 (N.D. Ill. July 26, 2017) (collecting cases). Harris need not "identify every other or even one other individual" who similarly suffered as a result of the alleged municipal practice. *White*, 829 F.3d at 844. But he must allege that his injury was the result of a practice that affected more than just him. *Gill*, 850 F.3d at 344. "[A] few sporadic examples of inappropriate behavior will not suffice." *Thomas*, 74 F.4th at 524 (citation and internal quotation marks omitted).

To satisfy the third factor, deliberate indifference element, plaintiff must allege that the City was "aware of the risk created by the unlawful widespread custom or practice and failed to take appropriate steps protect plaintiffs." *Fix v. City of Chicago*, 2022 WL 93503, at *3 (N.D. Ill. Jan. 10, 2022). "The City's continued adherence to an approach that it knows or should know has failed to prevent [unconstitutional] conduct … may establish the conscious disregard for the

consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Williams-Saddler*, 2024 WL 1677407, at *3 (cleaned up) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997)).

Defendants do not dispute that Harris sufficiently alleged an injury to his constitutional rights. *Thomas*, 74 F.4th at 524. Harris alleges that Officers caused him to be wrongfully convicted by fabricating evidence, including false witness statements and identifications, and withholding exculpatory evidence. [Dkt. 1 at ¶¶4–5.] That suffices at the motion to dismiss stage.

Next, to state a *Monell* claim, Harris must allege that the constitutional injury that befell him was caused by a municipal policy or custom. On this front, Harris's allegations are cursory. He alleges his wrongful conviction resulted from systemic police misconduct in Area Two, "where police officers were trained to fabricate evidence and withhold exculpatory evidence to secure wrongful convictions." [*Id.* ¶6.] Without naming names, Harris asserts that "[s]ince 2011, dozens of cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence" and "manipulat[ed] eyewitness identifications and testimony." [*Id.* at ¶¶98–99.] According to Harris, this is part of a pattern of CPD misconduct began before the Moore murder investigation which demonstrates that his injury was "the product of long-established policies and practices at [CPD]." [*Id.* at ¶100.]

Harris gets slightly more specific later in his complaint, alleging that CPD officers, including the defendants in this case, "systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable

reports, memos, and other information." [*Id.* at ¶104.] Harris alleges that these files were withheld from both the State's Attorney and criminal defendants and "routinely destroyed or hidden at the close of the investigation." [*Id.*] He asserts that "this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established in the cases of, *inter alia*, *Rivera*, No. 12 C 4428 (N.D. Ill.), *Fields*, No. 10 C 1168 (N.D. Ill.), and *Jones*, No. 87 C 2536 (N.D. Ill.)." [*Id.* at ¶106.]

Some of these allegations are boilerplate and conclusory, lacking sufficient factual assertions to support an inference that other people were impacted by the policy that led to Harris's wrongful conviction. *Peterson v. City of Chicago*, 2015 WL 13882814, at *3 (N.D. Ill. June 23, 2015) (collecting cases). Harris's discussion of clandestine files is more substantive, as is his citation to three cases which he alleges establish a policy of suppressing discoverable evidence. The problem is, those cases discuss policies from the 1980s, and there must be a temporal connection to support an inference that the injury suffered by plaintiff was caused by a *current* policy. *See Williams-Saddler*, 2024 WL 1677407, at *2; *see also See Taylor v. City of Chicago*, 2021 WL 4523203, at *3 (N.D. Ill. Oct. 4, 2021) (holding that DOJ report from 2017 could not establish a policy or practice two years later when plaintiff was arrested).

In *Williams-Saddler*, the court did not credit plaintiff's allegations of past unconstitutional conduct by police officers extending from 1968 until 2014, concluding they were too old to be "materially relevant" to whether the City had the same policy in 2023. 2024 WL 1677407 at 1–2. The same issue plagues Harris's complaint. The existence of an implicit policy in the 1980s does not support an

13

inference that CPD had the same policy when Harris was arrested and investigated in 2011.

Harris's allegation that there are "dozens of cases … in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence" and "manipulat[ed] eyewitness identifications and testimony," [Dkt. 1 at ¶¶98–99] fares no better. Particularly given the deficiency of his case citations in paragraph 106 of his Complaint, this vague reference to "dozens of cases" does not support the necessary inference that his injury was the result of a practice that affected more than just him. *Gill*, 850 F.3d at 344. The allegation is also deficient because it doesn't indicate when the evidence fabrication or suppression occurred—just when the cases "came to light." [Dkt. 1 at ¶¶98–99.]

Harris cites to several reports to allege the existence of a policy or practice. [*See id.* at ¶¶101–03, 110–12.] They are of no help. The Goldston report, published in 1991, is too old to be instructive and also does not establish a policy or practice with respect to mishandling evidence. Instead, per Harris's Complaint, it concerned "abuse." [*Id.* at ¶101.] The FBI Report discusses policies and practices from the 1990s, which cannot establish the existence of a policy or practice in 2011. *Williams-Saddler*, 2024 WL 1677407, at *2. Even if the DOJ reports Harris relies on were sufficiently current, *see Taylor*, 2021 WL 4523203, at *3, they discuss CPD supervision and training issues, not widespread practices concerning evidence suppression.

The code of silence allegations do not help Harris allege a policy or practice either. [Dkt. 1 at ¶¶114–17.] While Harris alleges certain individuals, including one

14

named defendant, "recently acknowledged" the code, he does not allege a time frame for when the code was in force. Harris's allegation that Defendant Lambert admitted officers asked him to fabricate a police report to cover up misconduct is too vague to move the needle. Even if Lambert testified that he was asked to fabricate a police report in 2011—the operative time for Harris's allegations—it would be insufficient. *See Thomas*, 74 F.4th at 524 ("Allegations of a few sporadic examples of inappropriate behavior will not suffice." (citation and internal quotation marks omitted)). Harris's complaint is also devoid of allegations that his constitutional injury was caused by the code of silence.

Harris's allegations similarly fail to allege deliberate indifference with respect to evidence suppression and fabrication. He contends that his constitutional violation occurred "because command personnel … concealed and suppressed their knowledge of ongoing police misconduct, blocked and undercut all efforts to expose, discipline, and prosecute offending officers and refused to intervene to stop the continuing egregious and criminally unconstitutional misconduct." [Dkt. 1 at ¶7.] This is insufficient to allege that the City was on notice of a widespread policy or practice of evidence suppression and fabrication in 2011 and chose to do nothing.

The reports Harris cites do not help him allege deliberate indifference either. The DOJ report post-dates Harris's investigation, therefore it could not put the City on notice for purposes of deliberate indifference. The other reports substantially pre-date Harris's investigation such that, even if they were a subject matter match, they do not support an inference that the policy was still active thirty or more years later.

Perhaps recognizing the dearth of allegations supporting a *Monell* claim for evidence suppression and fabrication, Harris tacks on a claim alleging that his constitutional violation caused by evidence suppression and fabrication was, in turn, caused by the City's policy or practice of failing to train and supervise officers.

"A municipality can be held liable under a theory of failure to train if it has actual knowledge of a pattern of criminally reckless conduct and there is an obvious need to provide training to avert harm." *Flores v. City of S. Bend*, 997 F.3d 725, 733 (7th Cir. 2021).

Harris's claim stumbles at the starting block. Harris "cannot merely … allege the City broadly had a policy that led to officer misconduct." *Jackson v. City of Chicago*, 2021 WL 3883111, at *6 (N.D. Ill. Aug. 31, 2021). "[H]e must allege some factual details about the nature of the policy and how that policy led to his alleged constitutional deprivation." *Id.*; *Garcia v. City of Chicago*, No. 17 C 3932, 2018 WL 3546742, at *3 (N.D. Ill. July 24, 2018) (finding allegations insufficient where plaintiff alleged that the City's failure to supervise and control police officers resulted in misconduct).

In his complaint, Harris "never explains what the City's actual practices are for … training, or where those practices are lacking." *Taylor v. City of Chicago*, 2021 WL 4523203, at *3 (N.D. Ill. Oct. 4, 2021); [*see* Dkt. 1 at ¶124 ("Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies.").] While Harris cites certain topics on which CPD allegedly failed to adequately train, such as preserving and

disclosing evidence and conducting live lineups, [Dkt. 1 at ¶123], he does not allege how or why CPD's practices were insufficient. The *Taylor* court found that omission fatal to demonstrating a custom or practice. 2021 WL 4523203, at *3; *Petropoulous v. City of Chicago*, 448 F. Supp. 3d 835, 840 (N.D. Ill. 2020).

Harris's allegations concerning training are also boilerplate and conclusory. *Carmona v. City of Chicago*, 2018 WL 1468995, at *3 (N.D. Ill. Mar. 26, 2018); [Dkt. 1 at ¶¶124, 301.] For example, Harris asserts that the policies and practices that caused his constitutional violation "were allowed to exist because municipal policymakers … exhibited deliberate indifference to the problem, thereby effectively ratifying it." [*Id*. at ¶301.] "Raw conclusions" like these "are not entitled to a presumption of truth." *Petropoulos*, 448 F. Supp. 3d at 840; *Duffin v. Dart*, 2018 WL 461229, at *5 (N.D. Ill. Jan. 18, 2018) (explaining a *Monell* claim cannot be premised on "boilerplate statements that repeat the elements of an official capacity claim without further factual content."); *Banks v. Dart*, 2023 WL 6388063, at *11 (N.D. Ill. Sept. 29, 2023) (same).

Harris cannot rely on the DOJ report to substantiate his claim. While it "certainly identifies serious shortcomings in CPD's supervisory systems" it is not "a master key to unlock discovery's door for any *Monell* claim against the City, no matter how scantily the plaintiff connects his claim to the report's findings." *Carmona*, 2018 WL 1468995, at *4. Furthermore, even if the Report, issued in 2016, could establish the existence of a widespread practice of deficient training and supervision in 2011, it cannot establish the notice necessary for a creditable assertion of deliberate

17

indifference. *See Williams-Saddler*, 2024 WL 1677407, at *3 (explaining that the Report could, in some cases, support allegations of notice where underlying incident occurred seven years after the report was published).

The insufficiency of Harris's failure to train claim is accentuated by the fact that the claim is inconsistent with his principal theory: that CPD officers including those investigating his case were *trained* to manufacture evidence. [Dkt. 1 at ¶6 (emphasis added).] While it is not impermissible for a complaint to allege inconsistent theories of relief, *American International Adjustment Co. v. Galvin*, 86 F.3d 1455, 1461 (7th Cir. 1996), here the inconsistency highlights the deficiency of Harris's attempt to bootstrap his *Monell* claim with a failure to train theory.

In passing, Harris alleges that CPD also had a practice of failing to discipline officers, which contributed to his constitutional injuries. He asserts that "the City … operated a dysfunctional disciplinary system for … officers accused of serious misconduct"; "had no mechanism for identify … officers who were repeatedly accused of … misconduct"; and "almost never imposed significant discipline against officers accused of civil rights violations." [Dkt. 1 at ¶109.] Because of this, the officer defendants in this case engaged in misconduct "because they had no reason to fear" that they would be disciplined as a result. [*Id.* at ¶119.]

Like Harris's failure to train claim, his failure to discipline claim fails because he "never articulates what the City's actual practice is for disciplining officers that engage in the misconduct that allegedly occurred." *Foy v. City of Chicago*, 2016 WL 2770880, at *9 (N.D. Ill. May 12, 2016). While Harris "succeeds in repeating all of the

18

trigger words required of a *Monell* claim," his complaint fails to allege "factual content to demonstrate a widespread practice of failing to adequately punish prior instances of similar misconduct." *Id.* His allegations fall short of the standard courts have considered sufficient to sustain a *Monell* claim against a motion to dismiss. *See e.g.*, *Arrington v. City of Chicago*, 2018 WL 620036, at *2 (N.D. Ill. Jan. 30, 2018) (describing specific allegations about CPD conduct supporting successful failure to discipline theory); *Carmona v. City of Chicago*, 2018 WL 306664, at *3 (N.D. Ill. Jan. 5, 2018) (collecting cases dismissing *Monell* failure-to-train theory as boilerplate).

Harris "failed to support the inference that the alleged lack of training caused the [his] constitutional deprivation." *Id.*; *Foy*, 2016 WL 2770880, at *9 (N.D. Ill. May 12, 2016) ("Plaintiff does not allege a single instance in which the City condoned similar behavior by officers … by either promoting an officer or not disciplining the officer despite punishment being warranted."). Consequently, his allegations are insufficient to sustain a *Monell* claim on any of his theories. The *Monell* claim is dismissed without prejudice.

### C.     Count VIII: Intentional Infliction of Emotional Distress

Officers move to dismiss Harris's IIED claim on statute of limitations grounds. Generally, there is a one-year statute of limitations beginning at the time of arrest to bring an IIED claim against a local government employee such as a police officer. 735 ILCS 10/8-101(a).

However, Illinois courts have applied *Heck v. Humphrey*, 512 U.S. 477 (1994), for state law claims like IIED. *Fulton v. Bartik*, 547 F. Supp. 3d 799, 822 (N.D. Ill.

2021). Under *Heck* "if judgment for a § 1983 plaintiff would necessarily imply the invalidity of his criminal conviction, that claim cannot proceed unless and until the plaintiff can show that the conviction has been invalidated by some official means, such as by a state court." *Id.* at 811. A *Heck*-barred claim does not accrue until the conviction is invalidated. *Heck*, 512 U.S. at 490 (holding that a "cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated"). That means that when an IIED claim is bound up in "a claim that the defendant officers fabricated an entire case against [the plaintiff] that led to his wrongful conviction" the one-year statute of limitations does not begin to run until the conviction is overturned. *Parish v. City of Elkhart*, 614 F.3d 677, 684 (7th Cir. 2010).

In *Parish*, the Seventh Circuit found *Heck* applied because Parish's factual allegations (which are quite similar to Harris's)—including that officers falsified and withheld evidence and coerced witnesses—were challenges to the conviction itself. *Id.* Consequently, Parish's IIED claim did not accrue until his exoneration. *Id.*

The Officers' citation to *Bridewell v. Eberle*, 730 F.3d 672 (7th Cir. 2013) is unavailing. *Bridewell* is not instructive and does not displace *Parish* because Bridewell did not challenge actions that led to his conviction. *See Sopron v. Cassidy*, 2022 WL 971563, at *5 (N.D. Ill. Mar. 31, 2022). Consequently, *Heck* did not apply, and the Court did not discuss it. *Id.*

Contrary to the Officers' contention, it would have been impossible for Harris to bring a successful IIED claim before his conviction was vacated in December 2023.

20

Harris "alleges that Defendants intentionally inflicted emotional distress by fabricating evidence, coercing witnesses …, and withholding exculpatory evidence, which ultimately caused his wrongful conviction." *Id.* Those allegations attack the basis for his conviction; therefore, his IIED claim depended on the favorable resolution to his conviction which did not occur until December 2023. *See Fulton*, 547 F. Supp. 3d at 822 (finding the IIED claim *Heck*-barred where "the alleged course of conduct forming the basis of the IIED claim went from arrest through prosecution and was perfected in plaintiffs' convictions"). Because Harris filed his complaint in April 2024, his IIED claim is timely, and the motion to dismiss this claim is denied.

### D. Counts X and XI: *Respondeat Superior* and Indemnification

Last, the City moves to dismiss both Counts X and XI, arguing that if claims against the Officers are dismissed, the corresponding *respondeat superior* and indemnification claim should be as well. Harris's liberty deprivation claim premised on the Fourth Amendment remains, so no claim against the Officers has been dismissed in its entirety. Therefore, the motion to dismiss Counts X and XI is denied.

## IV. Conclusion

For the reasons stated above, the Officers' motion to dismiss [Dkt. 33] Count III of Harris's complaint under the Fourteenth Amendment is granted with prejudice, as amendment would be futile. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 520 (7th Cir. 2015). Their motion to dismiss Count VIII for IIED is denied. The City's motion to dismiss [Dkt. 34] Harris's *Monell*

claim (Count VI) is granted without prejudice, but its motion to dismiss Counts X and XI is denied.

Enter: 24-cv-3215
Date:  December 18, 2024

_____
Lindsay C. Jenkins
United States District Judge

22