**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Darien Harris, | |
| *Plaintiff,* | No. 24 CV 3215 |
| v. | Judge Lindsay C. Jenkins |
| City of Chicago, *et al.*, | |
| *Defendants.* | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Darien Harris brings this lawsuit against the City of Chicago and certain police officers for injuries arising out of his wrongful conviction for the murder of Rondell Moore. For the reasons explained, the City's motion to dismiss [Dkt. 69] is granted.[1]

## I.      Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the plaintiff's claims. The Court takes well-pleaded factual allegations as true and draws reasonable inferences in the plaintiff's favor. *Reardon v. Danley*, 74 F.4th 825, 827 (7th Cir. 2023); *Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 638 (7th Cir. 2023). "To survive a motion to dismiss under Rule 12(b)(6), plaintiff's complaint must allege facts which, when taken as true, plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (cleaned up).

---

[1]      Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

## II.    Background[2]

Harris alleges that he was wrongfully convicted due to CPD fabricating evidence, including witness statements, and withholding exculpatory evidence. [Dkt. 60, ¶¶ 4–6.][3] He claims CPD had a variety of widespread unconstitutional practices. [*Id.* ¶ 100.] Those practices included (a) using coercive tactics, including psychological coercion, on suspects to obtain false statements and implicate suspects; (b) manufacturing evidence including false statements through coercion, manipulation, threats, pressure, and inducements; (c) contriving false narratives and feeding them to witnesses; and (d) suppressing and destroying exculpatory evidence developed through the tactics explained above. [*Id.*] Harris also claims that CPD systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports that were withheld from the State's Attorney and destroyed or hidden at the close of the investigation. [*Id.*, ¶ 107.] However, he does not allege that occurred in his case.

Since 1986, at least 150 cases have come to light in which CPD officers fabricated false evidence or suppressed exculpatory evidence to cause the convictions

---

[2]    The following factual allegations are taken from Harris' First Amended Complaint [dkt. 60] and are accepted as true for the purposes of the motion. *Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).
[3]    The court assumes familiarity with the facts as laid out in its prior order. [*See* dkt. 58.] As a result, it focuses only on the new, non-conclusory allegations contained within Harris's First Amended Complaint. [Dkt. 60.]

of innocent persons. [*Id.*, ¶ 101.] In many of these cases, CPD used the same tactics employed against Harris. [*Id.*, ¶ 103.]

One example is Adam Gray. [*Id.*, ¶ 109.] In 1993, CPD fabricated evidence and coerced witnesses in order to wrongfully convict him, including by intimidating witnesses into identifying him and using unduly suggestive line-up procedures. [*Id.*] After being convicted and serving nearly three decades in prison, a jury found CPD officers had coerced a false confession and fabricated evidence to frame him. [*Id.*] Harris does not allege precisely when the jury returned that verdict.

The City entered into settlements to resolve several cases with similar allegations. For example, between 1993 and 1995 CPD officers allegedly fabricated and withheld evidence, used threats, intimidation, and coercion, and fed facts to witnesses to secure the convictions of Montanez, Serrano, Hood, Washington, Almodovar, Negron, Ezell, Johnson, Styles, and McCoy. [*Id.*] Some of those defendants had their convictions vacated or were exonerated. [*Id.*] The City paid out settlements on those cases between 2021 and 2024. [*Id.*]

Harris alleges this pattern of misconduct continued through the 2010s and included the time of the Moore murder investigation. [*Id.*, ¶ 110.] He cites additional examples of misconduct that occurred between 2000 and 2006 and resulted in settlements. [*Id.*] For one cited example from 2003 involving defendant John Fulton, Harris alleges officers fabricated and withheld exculpatory evidence, and threatened and coerced witnesses into giving false statements. [*Id.*] However, Harris does not assert that Fulton's case resulted in settlement or a jury verdict in his favor. [*Id.*]

3

Last, Harris cites Marcel Brown's case, contending it involved fabricated and suppressed exculpatory evidence, which resulted in a jury verdict in his favor. [*Id.*]

Harris alleges that in 2011, the same year as his arrest (but before his conviction) hundreds of "street files" were found in a South Side Police Station. [*Id.*, ¶ 111.] The files, some of which were more than 10 years old, were not kept with the CPD's permanent records and therefore not subject to subpoena. [*Id.*] According to Harris, one person was wrongfully convicted after his suppressed street file was not turned over to his attorneys. [*Id.*]

Some of the officers involved in Harris's conviction perpetrated misconduct against others. [*Id.*, ¶ 112.] In 2000, Defendant Delfavero along with other CPD officers threatened a suspect about drug-dealing, telling him if he didn't implicate another person the officers would make sure he lost his job. [*Id.*] When that didn't work, the officers fabricated evidence, including planting drugs to ensure an arrest. [*Id.*] In a separate incident in 2001, Delfavero and other CPD officers slapped a suspect when he was in handcuffs and then threatened to plant drugs on others involved in the incident. [*Id.*]

Defendant Besteda was also allegedly involved in prior misconduct. [*Id.*] In 2007, he falsely testified and withheld material evidence during the investigation of another police officer. [*Id.*] Defendants Barsch and Weber were allegedly involved in withholding and fabricating evidence in 2011. [*Id.*] In 2012, Defendant Jones and other CPD officers fabricated reports and withheld evidence that they used unduly

suggestive identification procedures. [*Id.*] That conduct led to a wrongful conviction. [*Id.*]

CPD's policies and practices allowed Defendants to commit serious misconduct and cover up misconduct without meaningful supervision or meaningful consequences. [*Id.*, ¶ 113.] Defendants and other CPD officers were encouraged to cover up misconduct by destroying evidence, lying, and creating false police reports. [*Id.*] By the time of the investigation into the Moore murder, these patterns and practices were firmly established and constituted the *de facto* policy of the CPD. [*Id.*, ¶ 114.] Chicago policymakers had knowledge of many incidents of serious misconduct, but took no meaningful steps to redress them. [*Id.*, ¶ 116.] Instead, command personnel knew of, and participated in, unconstitutional acts used to close cases and enhance police officers' personal standing within the department. [*Id.*, ¶ 117.]

The City's failure to implement sufficient training within CPD allowed the unconstitutional polices and practices to thrive. [*Id.*, ¶ 118.] In the years immediately preceding and following the Moore murder investigation, the City had no meaningful training to ensure officers used appropriate and constitutional techniques when conducting interviews. [*Id.*] Specifically, officers received no meaningful training on (a) the appropriate duration of interrogations; (b) appropriate interview techniques for blind persons, juveniles, and persons with limited or diminished capacities, including the need to exercise care and caution; (c) documenting interviews and interrogations; (d) reviewing instances where confessions were suppressed to learn

from and avoid repeating prior errors; (e) properly conducting live lineups, photographic arrays, and other identification procedures; and (f) obtaining statements without coercion. [*Id.*] According to Harris, the need for such training was both obvious and evidenced by the many incidents such as those identified above, that led to false identifications and violation of constitutional rights. [*Id.*] In addition, Harris identifies the following areas where Officers received no meaningful training: (a) how to conduct a thorough investigation absent eyewitness identification or confession, including how to develop reliable evidence; (b) how to conduct an honest investigation in light of department pressure to close cases; (c) how to properly document all investigative steps; and (d) how to document and preserve exculpatory evidence for disclosure. [*Id.*, ¶ 119.] These gaps in training, like the others mentioned, were obvious and demonstrated by the many incidents discussed above which were known to City policymakers. [*Id.*] These training deficiencies continued throughout the early 2000s and 2010s including when Harris was prosecuted and convicted. [*Id.*, ¶ 120.]

Harris alleges that CPD maintained a "code of silence" in the years preceding and following his prosecution and conviction. [*Id.*, ¶ 123.] The code eliminated accountability, discipline, or oversight. [*Id.*] In 2015, the then-Mayor acknowledged the code, describing it as "the tendency to ignore. It is the tendency to deny. It is the tendency in some cases to cover-up the bad actions of a colleague or colleagues." [*Id.*] As a result, Defendants had reason to know that they enjoyed *de facto* immunity from

criminal prosecution and departmental discipline and, in fact, stood to be rewarded for closing cases. [*Id.*, ¶ 124.]

## III.    Analysis

As he did in his original complaint, Harris brings several claims both against the individual officer defendants and the City of Chicago:  (1) evidence fabrication in violation of the Due Process Clause of the Fourteenth Amendment under 42 U.S.C. § 1983; (2) suppression and withholding evidence in violation of the Due Process Clause of the Fourteenth Amendment under § 1983; (3) deprivation of liberty without probable cause in violation of the Fourth and Fourteenth Amendments under § 1983;[4] (4) failure to intervene in violation of § 1983; (5) conspiracy to deprive him of his constitutional rights under § 1983; (6) a *Monell* policy and practice claim against the City of Chicago under § 1983; (7) a state law claim for malicious prosecution; (8) a state law intentional infliction of  emotional distress claim; (9) a state law civil conspiracy claim; (10) a state law *respondeat superior* claim; and finally (11) a state law indemnification claim. [Dkt. 60.]

This time around, the City challenges only Count VI, the *Monell* claim. [Dkt. 69.]

### A.    *Monell* Generally

A *Monell* claim challenges the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

---

[4]      The court previously dismissed with prejudice the iteration of this claim premised on a violation of the Fourteenth Amendment because that theory is foreclosed per *Lewis v. City of Chicago*, 914 F.3d, 472 (7th Cir. 2019). [Dkt. 58 at 9.] Plaintiff is instructed to amend his complaint accordingly.

represent official policy." *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 694 (2018).

"For a *Monell* claim to survive a motion to dismiss, a plaintiff must plead facts that plausibly suggest" four factors are met. *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 524 (7th Cir. 2023). First, that he was deprived of a constitutional right; second, that the deprivation can be traced to some municipal action (*i.e.* a policy or custom); third, that the policy or custom demonstrates municipal fault (*i.e.* deliberate indifference); and fourth, that the municipal action was the moving force behind the federal-rights violation. *Id.*

Related to the second factor, the Seventh Circuit has recognized "three types of municipal action that can support municipal liability under § 1983: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022) (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)).

While Harris disputes this issue in his opposition brief, [dkt. 76 at 4], his well-pled allegations support only a widespread practice theory, both with regard to evidence fabrication and suppression and regarding training and discipline. Contrary to his assertion, the allegations in his complaint do not support that the constitutional injuries alleged were inflicted by a person with final policymaking authority. [*Id.*; dkt. 80 at 13, n.9.]

8

While Federal Rule of Civil Procedure 8(a)—not some higher standard—applies to causes of action for municipal liability, *White v. City of Chicago*, 829 F.3d 837, 843–44 (7th Cir. 2016), when it comes to alleging a widespread policy or custom, the plaintiff must allege others were impacted by the same policy that caused his injury, *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (affirming dismissal of *Monell* claim where plaintiff failed to allege that police officers took similar actions against other people). Where plaintiff's only allegations pertain to his own alleged constitutional violation and do not permit an inference that the violation was caused by a policy or practice that impacted others, courts have dismissed *Monell* claims at the motion to dismiss stage. *Walker v. City of Chicago*, 596 F. Supp. 3d 1064, 1074 (N.D. Ill. 2022) *(*explaining that in many instances, the nature and specifics of the "underlying constitutional claim demand that more than one instance is needed to make out a plausible inference for the existence of a widespread but unwritten policy or custom with the force of law.") Despite that requirement, Harris need not "identify every other or even one other individual" who similarly suffered as a result of the alleged municipal practice. *White*, 829 F.3d at 844. But he must allege that his injury was the result of a practice that affected more than just him. *Gill*, 850 F.3d at 344. "[A] few sporadic examples of inappropriate behavior will not suffice." *Thomas*, 74 F.4th at 524 (citation and internal quotation marks omitted).

To satisfy the third factor, the deliberate indifference element, plaintiff must allege that the City was "aware of the risk created by the unlawful widespread custom or practice and failed to take appropriate steps protect plaintiffs." *Fix v. City of*

*Chicago*, 2022 WL 93503, at *3 (N.D. Ill. Jan. 10, 2022). "The City's continued adherence to an approach that it knows or should know has failed to prevent [unconstitutional] conduct … may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Williams-Saddler*, 2024 WL 1677407, at *3 (cleaned up) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997)).

Defendants do not dispute that Harris sufficiently alleged an injury to his constitutional rights. *Thomas*, 74 F.4th at 524. Harris alleges that Officers caused him to be wrongfully convicted by fabricating evidence, including false witness statements and identifications, and withholding exculpatory evidence. [Dkt. 1 at ¶¶ 4–5.] He also alleges that the City's lack of training and discipline allowed for such violations to occur. [*Id.* ¶¶ 113, 118, 125.] That suffices at the motion to dismiss stage.

### B.  *Monell* Claim for Evidence Fabrication and Suppression

To state a *Monell* claim for evidence fabrication and suppression, Harris must allege that CPD had a policy or practice with respect to evidence fabrication and suppression in 2011, when he was arrested and prosecuted.

Harris alleged that there have been at least 150 cases since 1986 where CPD officers fabricated evidence or suppressed exculpatory evidence to convict innocent people. [Dkt. 60, ¶ 101.] As the court explained previously with respect to a similar claim in Harris's first complaint, this assertion is too vague to be credited. [Dkt. 58 at 14.] This time, Harris cites specific cases involving unconstitutional evidence practices. [Dkt. 60, ¶¶ 109–10.] Some of these cases did not result in a finding of

liability, though, only settlement; for at least one example, Harris does not allege the status of the case at all. [*Id.*, ¶ 110(c).]

The City contends that nothing short of a finding of liability can establish a policy or practice for purposes of a *Monell* claim. That argument has some support. *See Arquero v. Dart*, 587 F.Supp.3d 721, 730 (N.D. Ill. 2022) (finding that plaintiff's citation "to four lawsuits against the Sheriff's Department for a policy or practice of detaining individuals beyond their release date" could not establish a policy or practice because "[a] lawsuit is an allegation" so it only "establishes that other people have made accusations"); *Darko v. City of Chicago, Illinois*, 2024 WL 2209675, at *4 (N.D. Ill. May 15, 2024) (same); *Hernandez v. Nielson*, 2002 WL 31804788, at *1 (N.D. Ill. Dec. 13, 2002) (finding that settlement of two cases alleging use of excessive force could not "show a widespread practice" because "there was never any finding of liability").

*Harris* does not meaningfully dispute this point. He cites to *White*, 829 F.3d at 843–44, for the proposition that a § 1983 plaintiff asserting a claim of *Monell* liability need not offer other examples beyond alleging that the officer's conduct conformed with an official policy or custom. [Dkt. 76 at 3.] But *White* is not the silver bullet for all *Monell* claims, absolving the plaintiff of the responsibility to plausibly allege a custom or practice. The issue in *White* was whether CPD had an unconstitutional policy of supporting arrest warrants with insufficient factual information to establish probable cause. 829 F.3d at 839. The Court found that White's individual allegation about the officer in question was bolstered by his allegation that the officer used a

standard CPD warrant form "that d[id] not require specific factual support for an application for an arrest warrant." *Id.* at 844. The fact that CPD had a standard form was strong evidence of a policy of not including sufficient facts to support requests for warrants.

Harris points to no similar allegation in his case, so he relies on past cases in an attempt to substantiate the existence of a policy or practice within CPD. The court agrees with the City. A finding of liability either by judge or jury confirms the existence of unconstitutional practices in a way settlements and allegations do not. If settlements were afforded the same status as verdicts, that could dissuade litigants from engaging settlement to resolve cases. Further, it treats settlements as admissions of liability, when they typically include disclaimers on that point. Allegations are even further afield. They say nothing about an organization's actual policies, only what a plaintiff believes to be true about those policies.

Focusing then only on Harris's allegations about cases that resulted in a verdict, the field of view shrinks to: (1) Adam Gray's case involving evidence fabrication and coercion in 1993; (2) Marcel Brown's case involving evidence fabrication and suppression in 2008.[5] Gray's case establishing CPD practices in the '90s does not establish the same policy persisted in 2011. *Thomas v. City of Markham*, 2017 WL 4340182, at \*5 (N.D. Ill. Sept. 29, 2017) (explaining that where there is a "five-year gap" between documented past events and the incident at issue, the "Court

---

[5]     While Harris did not allege the relevant time period for Brown's case, the court takes judicial notice of the verdict.

cannot reasonably infer a 'true municipal policy' was at work" (citing *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)).

Even assuming Brown's case was close enough in time to establish an active policy and practice in 2011, it is only one example. The Seventh Circuit instructs that "[a]llegations of a few sporadic examples of inappropriate behavior will not suffice." *Thomas*, 74 F.4th at 524 (citation and internal quotation marks omitted).

Like in his original complaint, Harris again cites several reports to substantiate the existence of a policy or practice. Without belaboring the point discussed previously, the Goldstone Report is irrelevant because it is too temporally distant and concerns physical abuse, not evidence issues; the FD-302 Report is not instructive because it concerns conduct in the 1990s; and the DOJ Report concerns supervision and training (an issue that will be discussed separately). [Dkt. 58 at 14–15.] As for the 2016 CPD Accountability Task Force Report, Harris does not allege in his complaint what time period that report covered, or the subject matter of any findings; his vague quote about CPD missing "opportunities to make accountability an organizational priority" doesn't cut it. [Dkt. 60, ¶ 122.] Ultimately, none of the reports support Harris's allegation that in 2011 CPD had a policy or practice of evidence fabrication and suppression.

Harris's complaint also cites allegations about prior misconduct by the individual officer defendants involved in his arrest and prosecution to try to establish a policy or practice. The City counters that the allegations are not temporally relevant, involve different types of misconduct, are extremely vague, and even if they

13

were credible, the number of allegations are too scant to establish a policy or practice. [Dkt. 69 at 13–14.] Furthermore, the City argues that without evidence that such conduct led to liability, the evidence does not plausibly suggest a policy or practice. [Dkt. 80 at 7–8.]

The allegations concerning Defavero from 2000 and 2001 are too temporally remote. *Thomas*, 2017 WL 4340182, at *5. The allegations concerning Besteda, Barsch, Weber, and Jones from 2007–2012 have more weight. They also allegedly concern evidence suppression and fabrication issues, making those occurrences a subject-matter match with Harris's case. *Cf. Williams-Saddler v. Lancaster*, 2024 WL 1677407, at *2 (N.D. Ill. Apr. 18, 2024) (explaining that documented past incidents that occurred nine years prior were "so old and outrageous that they [were] not materially relevant to determining whether the City" had the relevant practice in 2023).

However, the *Arquero*, *Darko*, and *Hernandez* cases caution against assigning weight to, what appears to be, unsubstantiated allegations of fault on the part of those officers. *Arquero*, 587 F.Supp.3d at 730; *Darko*, 2024 WL 2209675, at *4; *Hernandez*, 2002 WL 31804788, at *1. Harris's pleading leaves completely open the question of whether any of this alleged misconduct was confirmed through a verdict. In briefing, Harris admits "Plaintiff has no idea whether or not these incidents resulted in lawsuits … Plaintiff expects these answers in discovery." [Dkt. 76 at 9.]

14

But if the allegations haven't been tested through litigation, they are insufficient to make plausible Harris's claim with respect to a policy or practice.

Last up for discussion with respect to evidence issues are Harris's allegations concerning a code of conduct and street files.

Harris's complaint leaves unestablished whether the code of silence is its own alleged policy or practice or whether it is merely evidence of a policy or practice with respect to evidence suppression (or something else). Harris claims the code eliminated accountability, discipline, or oversight in CPD, and cites the then-Mayor's 2015 description of the code as "the tendency to ignore. It is the tendency to deny. It is the tendency in some cases to cover-up the bad actions of a colleague or colleagues." [Dkt. 60, ¶ 123.] This allegation doesn't move the needle for the same reasons already discussed: (1) it's unclear what period of time any code of silence was active, specifically whether it was active in 2011; and (2) Harris fails to allege how (or if) any code of silence contributed the constitutional issues in his case.

In briefing, Harris clarifies that his street files allegations are meant to support his theory that the City had a regular practice of withholding exculpatory evidence in 2011. [*See* dkt. 76 at 11, 15.] He alleges that hundreds of "street files" were found in 2011 (the time of his arrest and prosecution), some of which were more than 10 years old. [Dkt. 60, ¶ 111.] He then cites, as an example, one person

wrongfully convicted whose street file was discovered and had not been produced as required during his prosecution. [*Id.*]

Harris's assertion that the files included some that were "older than 10 years" does little to establish that CPD had a policy of using street files close in time to when Harris was arrested and prosecuted. [Dkt. 60, ¶ 111.] The parties confuse the issue in briefing, with Harris claiming that the "buried street files directly supports [his] allegation that the City maintained a regular practice of withholding exculpatory evidence in 2011." [Dkt. 76 at 11.] Harris provides no reason to believe that CPD engaged in the practice of using street files up until the time the files were discovered in 2011, and therefore, during the time of Harris's arrest and prosecution. It would have been different if Harris had alleged that some of the street files found were from prosecutions in 2011. As it stands, even the example he provides of Nathson Fields falls short, since his allegations make clear that Fields's arrest occurred around 2006, five years before Harris's arrest and prosecution. [Dkt. 60, ¶ 111.]

Putting that issue to the side, for the same reasons discussed last time with respect to the DOJ report, the court is hesitant to permit these street files to be "a master key to unlock discovery's door for any *Monell* claim against the City, no matter how scantily the plaintiff connects his claim to the report's findings." *Carmona v. City of Chicago*, 2018 WL 306664, at \*4 (N.D. Ill. Jan. 5, 2018). Harris does not allege that any street file was discovered for his case, or that any of the officers in his case engaged in the practice of using street files. *See Williams v. City of Chicago*, 315 F. Supp. 3d 1060, 1069 (N.D. Ill. 2018) (considering street files allegation and allowing

16

*Monell* claim to proceed where plaintiff tied allegations of street files with practice in his case where "three GPRs were lost or destroyed") Simply put—and as Harris admits—there is no connection between his alleged constitutional injury and this street file allegation. That cannot be enough to substantiate a *Monell* claim.

Stepping back and considering all Harris's well-pled assertions collectively, there is very little to support the existence of a policy or practice of evidence fabrication or suppression in 2011—only the Brown case from 2008. Nonetheless, the court proceeds with the analysis to consider deliberate indifference.

Harris's allegations must make plausible that in 2011 the City was aware of its policy or practice with respect to evidence fabrication and suppression. Like last time, the reports do not aid Harris in establishing the notice necessary for deliberate indifference. [Dkt. 58 at 15.] They either post-date the time of Harris's arrest and prosecution or pre-date Harris's investigation such that, even if they were a subject matter match, they do not support the inference that any policy was still active. The Goldstone Report discussed conduct from the 1990s, and is therefore too old to substantiate deliberate indifference in 2011; it also concerned physical abuse. [Dkt. 60, ¶ 105.] The FBI FD-302 report is too old as it concerns conduct from the 1990s. [*Id.*, ¶ 106.] The 2016 report from the Chicago Police Accountability Task Force does not appear to be a subject matter match; Harris only alleges that the report found "CPD has missed opportunities to make accountability an organizational propriety." [*Id.*, ¶ 122.] That statement is too vague to show that in 2011, CPD was on notice about its allegedly unconstitutional practices with respect to evidence. The same goes

17

for the 2015 DOJ report which, as the court previously explained, post-dates CPD's investigation of Harris such that it cannot supply notice for deliberate indifference. [Dkt. 58 at 15–16.]

For a variety of reasons, the lawsuits Harris cites in support of a policy or practice cannot support his claim of deliberate indifference. First, Harris fails to include allegations about when many of these cases were resolved making it impossible to determine whether the City was on notice at the relevant time. [Dkt. 60, ¶¶ 109–10.] This includes the cases Harris cites with respect to the Defendant officers involved in his arrest and prosecution; Harris does not allege how (or if) those cases were resolved. [*Id.*, ¶ 112.] Second, many of the cases he cites weren't resolved until after 2011, so they cannot have provided notice to the City in 2011. [*Id.* ¶¶ 109–110.] Third, and conversely, other cases are too old, for example, being resolved in 2006. [*Id.*]; *Thomas*, 2017 WL 4340182, at *5. Fourth, even assuming that a settlement could provide notice for purpose of deliberate indifference,[6] the other cases are too factually dissimilar to provide notice with respect to evidence fabrication and withholding. [*See* dkt. 60 ¶ 110.]

Harris also alleges that deliberate indifference can be inferred from circumstantial evidence. [Dkt. 76 at 14.] While that may be true, Harris's citation to *Vinning-El v. Long* is uninstructive. 482 F.3d 923, 925 (7th Cir. 2007). There the Court concluded, at summary judgment, that a jury could infer that a prison guard

---

[6]     While the court need not resolve this issue, for purposes of establishing deliberate indifference settlements do not appear to present the same problems as they do for purposes of establishing a policy or practice. Execution of a settlement agreement appears to put the issue directly before the City, making it aware of the conduct at issue.

working in the vicinity of plaintiff's cell would have known about plaintiff's living conditions in prison, including "a floor covered with water, a broken toilet, feces and blood smeared along the wall, and no mattress to sleep on." *Id. Vinning-El* was an Eighth Amendment deliberate indifference case; not a *Monell* case concerning city liability. Not to mention, Harris hasn't alleged circumstantial evidence to make plausible the City's awareness of a policy or practice with respect to evidence suppression and fabrication in 2011. In briefing, Harris argues that "policymakers were aware of rampant misconduct" but failed to take steps to rectify the situation. [Dkt. 76 at 14.] Harris's complaint includes a few allegations concerning policymakers, each more boilerplate than the last and completely devoid of supporting facts. [Dkt. 60, ¶¶ 115–16, 118–119, 123, 301–02.] For example, he alleges that "[t]his policy or custom of widespread misconduct was able to exist and thrive because municipal policymakers with authority over the same either concurred with the practices or exhibited deliberate indifference to the problem." [*Id.*, ¶ 115.] Allegations like those get Harris no closer to stating a claim. *Petropoulos v. City of Chicago*, 448 F. Supp. 3d 835, 840 (N.D. Ill. 2020) ("Raw conclusions are not entitled to the presumption of truth.").

Reading his complaint generously, the only potential policymaker is the City's former Mayor who spoke publicly about CPD's code of silence. [*Id.*, ¶ 123.] Because the statements came in 2015, years after Harris's prosecution, they cannot show deliberate indifference in 2011.

Even if Harris had plausibly alleged a policy or practice with respect to evidence suppression and fabrication, his complaint fails to allege that the City was deliberately indifferent in 2011. His *Monell* claim with respect to evidence practices is therefore dismissed.

### C.   *Monell* Claim for Failure to Train or Discipline

"Failure to train claims are a tenuous form of *Monell* liability." *MacDonald v. City of Desplaines*, 2025 WL 1883574, at *5 (N.D. Ill. July 8, 2025) (citation and internal quotation marks omitted). Liability lies on the City "only when inadequate training amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* (cleaned up) (citing *Flores v. City of S. Bend*, 997 F.3d 725, 731 (7th Cir. 2021). In some cases, "proof of widespread constitutional violations" is unnecessary "before that failure becomes actionable"; however, a single violation suffices only where there is a "recurring, obvious risk." *Id.* (citing *Flores*, 997 F.3d at 731). Similarly with a failure to discipline claim, the plaintiff must allege "a failure to provide adequate training in light of foreseeable consequences or a failure to act in response to repeated complaints of constitutional violations by its officers." *Jackson v. City of Chicago*, 2021 WL 3883111, at *5 (N.D. Ill. Aug. 31, 2021) (citation and internal quotation marks omitted).

Ultimately, none of Harris's allegations make plausible that the City was deliberately indifferent in 2011 in the face of either a slate of constitutional violations or an obvious risk presented by its training and discipline policies.

As the court previously explained, the reports are either uninstructive temporally or because of their subject matter. The one exception might be the DOJ

report which made findings concerning CPDs deficient training practices, but that report cannot establish deliberate indifference because it was published after 2011. [Dkt. 58 at 17–18.] The same goes for the former Mayor's statement concerning the code of silence; even assuming a subject-matter match, the statement, made in 2015, couldn't supply the notice necessary for deliberate indifference in 2011.

Evaluating Harris's failure to train and discipline allegations in his original complaint, the court noted that he failed to "articulate[] what the City's actual practice [was] for disciplining officers" or training them. *Foy v. City of Chicago*, 2016 WL 2770880, at *9 (N.D. Ill. May 12, 2016); *Petropoulos*, 448 F. Supp. 3d at 840. It is incumbent on plaintiff to allege how and why CPD's practices were insufficient. *Id.* Harris does a bit more this time around, specifying topics on which the City had "no meaningful training." [Dkt. 60 ¶ 118.] For example, Harris alleges CPD had insufficient training on how to interview blind persons, attempting to connect that shortcoming with his conviction, in which CPD allegedly fabricated the statements of a legally blind witness in order to frame Harris. [*Id.*, ¶¶ 2, 92.] Still, Harris "never articulate[s] what the City's actual [discipline and training] practice[s]" are, only that whatever policies it had were insufficient. *Carmona*, 2018 WL 306664, at *3. And, his allegations, in substance, remain boilerplate. [*See, e.g.*, dkt. 60, ¶¶ 113, 116–17, 120, 301.]

Harris's allegations supporting his failure to discipline claim are also boilerplate and/or insufficient. For example, like in his original complaint, Harris cites a statistic claiming that "between 2004 and 2016 the City recommended

21

disciplinary action in fewer than 4% of the cases in which it paid settlements … and did not conduct any disciplinary investigations in over half those cases." [Dkt. 60, ¶ 113.] Without more detail, it's unclear which way this statistic cuts in determining the existence of a policy or practice with respect to discipline. In his amended complaint, Harris attempts to bolster his discipline claim by alleging that CPD officers felt pressure to close cases, including resorting to unconstitutional methods. To that end he alleges that CPD "had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but that they also stood to be rewarded for closing cases no matter the costs." [*Id.*, ¶ 124.]

Even assuming this bare bones allegation was enough, Harris's complaint fails to allege deliberate indifference with respect to discipline. None of the cases Harris cites, including the cases involving Defendant officers, concern disciplinary failings such that the City was put on notice in 2011.

Most importantly, "[a] plaintiff suing under *Monell* must also demonstrate that the City's custom or practice caused his constitutional rights to be violated." *Taylor v. City of Chicago*, 2021 WL 4523203, at *4 (N.D. Ill. Oct. 4, 2021). With respect to his training and discipline claims, Harris "fail[s] to support the inference that [they] … caused [his] constitutional deprivation." *Carmona*, 2018 WL 306664, at *3.

There remains tension with Harris's failure to train theory. He alleges his injury was caused by CPD officers' deliberate unconstitutional conduct, including manufacturing evidence, [*see e.g.*, *id.*, ¶¶ 2, 6], but also that the City had a policy and practice of failing to train its police officers. As the Supreme Court noted, "it

is … difficult … to even accept the submission that someone pursues a 'policy' of 'inadequate training,' unless evidence be adduced which proves that the inadequate resulted from conscious choice." *Calhoun*, 408 F.3d at 380 (7th Cir. 2005) (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). Certainly, Harris has not alleged that CPD purposefully failed to train or discipline its officers.

While it's possible that lack of training or discipline could result in officers engaging in unconstitutional policing practices, Harris's allegations do not make the conclusion plausible in his case.

## IV.    Conclusion

For the reasons stated above, the City's motion to dismiss [Dkt. 60] the *Monell* claim (Count VI) is granted. Because Plaintiff already had an opportunity to amend, dismissal is with prejudice. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 520 (7th Cir. 2015).

Enter: 24-cv-3215
Date: July 21, 2025

_____
Lindsay C. Jenkins

23